UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SENECA INSURANCE COMPANY as subrogee of BARON EQUITIES, INC., a California corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>MCALVAIN CONSTRUCTION, INC., an Idaho corporation; HOLST ARCHITECTURE, INC., an Oregon corporation; SHILO AUTOMATIC SPRINKLER, INC., an Idaho corporation; BUILDER SERVICES GROUP, INC., a Florida corporation; TREASURE VALLEY CONSTRUCTION, LLC, an Idaho limited liability corporation; and DOES 1 through 5, inclusive.<br><br>        Defendants.<br><br>MCALVAIN CONSTRUCTION, INC.,<br>        Cross-Plaintiff,<br><br>    v.<br><br>SHILO AUTOMATIC SPRINKLER, INC., an Idaho corporation; BUILDER SERVICES GROUP, INC., a Florida corporation; and TREASURE VALLEY CONSTRUCTION, LLC, an Idaho limited liability company,<br><br>        Cross-Defendants. | Case No. 1:24-cv-00340-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

Before the Court is Defendant and Cross-Plaintiff McAlvain Construction, Inc.'s motion for summary judgment. Defendants and Cross-Defendants Shilo Automatic Sprinkler, Inc. and Builder Services Group, Inc. join the motion. For the reasons explained below, the Court will deny McAlvain's motion in its entirety and grant in part and deny in part Shilo Automatic Sprinkler's and Builder Services Group's motions. In sum, the Court will grant summary judgment on Seneca's contract-based claims against Shilo Automatic Sprinkler and Builder Services Group. All other claims will proceed to trial.

# FACTS

## A. The January 2024 Loss

In January 2024, a fire-suppression water line located in The Vanguard—an eight-story apartment building in downtown Boise—froze and burst, causing extensive damage. Baron Equities, Inc., the owner of the building, submitted a claim to its insurance company, Seneca Insurance Company. Seneca paid the claim, and then sued as Baron's subrogee. The defendants in this matter include the general contractor, McAlvain Construction, Inc., the architect, Holst Architecture, Inc., and subcontractors Shilo Automatic Sprinkler, Inc., Builder Services Group, Inc., and Treasure Valley General Construction, LLC.

**B.    600 Vanguard LLC and McAlvain Enter into a Contract for Construction of The Vanguard Apartment Building**

The Vanguard is a relatively new building; construction began a few years before the January 2024 loss and was completed by March 2022. The previous owner of the property, 600 Vanguard LLC, engaged McAlvain as the general contractor. McAlvain, in turn, engaged subcontractors to perform portions of the work, including Shilo Automatic Sprinkler, Builder Services Group, and Treasure Valley Construction.

The parties have not provided the Court with all of the construction contracts, but they have supplied the general conditions McAlvain and 600 Vanguard agreed upon. These conditions are contained in an American Institute of Architects (AIA) document known as the *AIA A201-2017 General Conditions of the Contract for Construction*. *See Ex. A to Thielbahr Dec.*, Dkt. 45-2. Three sections of the General Conditions—Sections 11.3.1, 11.3.2, and 13.2.1—are discussed in the briefing and relevant to this motion.

Sections 11.3.1 and 11.3.2 deal with insurance and related waivers. Specifically, in § 11.3.1 the parties agreed to waive rights against each other for damages caused by fire or other causes of loss, to the extent such losses were covered by property insurance required by the agreement or otherwise applicable to the project. The waiver-of-subrogation clause states:

§ **11.3.1** The Owner [600 Vanguard] and Contractor [McAlvain]

MEMORANDUM DECISION AND ORDER - 3

> waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents, and employees, each of the other . . . for damages caused by fire, or other causes of loss, to the extent those losses are covered by property insurance required by the Agreement or other property insurance applicable to the Project . . . .

*General Conditions,* Dkt. 45-2, § 11.3.1.

The next section, § 11.3.2 provides that if, after final payment, insurance is to be provided on the completed project, then the waiver just discussed would continue in effect to the extent permissible under such policies:

> **§ 11.3.2** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or *if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, to the extent permissible by such policies, the Owner waives all rights in accordance with the terms of Section 11.3.1 for damages caused by fire or other causes of loss covered by this separate property insurance.*

*Id.* § 11.3.2 (emphasis added).

In the third relevant clause, McAlvain and 600 Vanguard agreed that their successors and assigns would be bound by their agreement, although they agreed that neither party would assign the "Contract as a whole" without written consent of the other. The successors-and-assigns clause is shown here:

> **§ 13.2 Successors and Assigns**
> **§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns, and legal representatives to covenants, agreements, and obligations contained in the Contract Documents. Except as provided in Section 13.2.2 [which is not relevant here], neither party to the Contract shall assign the Contract as a whole without written consent of the

MEMORANDUM DECISION AND ORDER - 4

other. If either party attempts to make an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

*Id.* § 13.2.1.

**C.     Concord Capital Partners Enters into a Purchase & Sale Agreement with 600 Vanguard**

In May 2021, 600 Vanguard agreed to sell The Vanguard to Concord Capital Partners, LLC for $23 million. The parties memorialized their agreement in a Commercial/Investment Real Estate Purchase and Sale Agreement (PSA). *See Ex. B to Thielbahr Dec.*, Dkt. 45-3. The PSA contains a detailed listing of items included in the sale, which included 600 Vanguard's "rights in and to" the "Construction Contracts"—including the warranties and guaranties related to those contracts. The relevant provision states:

> INCLUDED ITEMS: …. Other items specifically INCLUDED in this sale: … Seller's rights in and to (a) all design, engineering, and construction contracts pertaining to the improvements on the Real Property . . . (collectively, "Construction Contracts"), and the warranties and guaranties related to any such Construction Contracts . . . .

*Id.*

In a separate section, titled "Condition of Property at Closing, " Concord assumed "all obligations with respect to the Property to the extent arising or accruing after the Closing Date, to the extent such obligations are necessary to maintain proper maintenance or operation of the Property, or to the extent

MEMORANDUM DECISION AND ORDER - 5

expressly agreed to be assumed by [Concord]." *Id.* § 16. In an addendum, 600 Vanguard agreed that it would "maintain (a) or cause the contractor(s) under Construction Contracts to maintain builder's risk insurance in the amount of the cost to cause Final Completion, and (b) commercial general liability insurance which is at least equivalent in all material respects to such insurance policy covering the Property as of the date of mutual execution of this Agreement." *Id. Addendum #1, § 5(f).* After several addendums the PSA was to close on April 23, 2022.

**D.     Baron Acquires the Building and Obtains Commercial Insurance**

The City of Boise issued a Certificate of Occupancy for the apartment building on March 25, 2022. Shortly afterward, on or about April 4, 2022, Concord assigned its rights in the PSA to Baron. Concord and Baron memorialized their agreement in an Agreement for Assignment and Assumption of Commercial/Investment Real Estate Purchase and Sale Agreement. *See Ex. C to Thielbahr Dec.,* Dkt. 45-4. After acquiring The Vanguard, Baron obtained commercial property insurance from Seneca. According to Baron's CEO, Heath Gregory, Baron: (1) purchased a Seneca policy effective April 26, 2022 – April 26, 2023; (2) purchased a one-month extension through May 26, 2023, and then (3) purchased a new Seneca policy effective May 26, 2023 – May 26, 2024. *Gregory Dec.* ¶ 7, Dkt. 53-7. Mr. Gregory states that the Seneca policies Baron obtained

were not builder's risk policies and were not intended to continue or replace any prior coverage maintained by 600 Vanguard, McAlvain, or any other party. *Id.* ¶ 8. The Seneca policy permits Baron to waive rights in writing under certain conditions.[1] *See Ex. F to Thielbahr Ex.,* Dkt. 45-7. Baron did not execute a separate waiver before the loss. *See Gregory Dec.* ¶ 9, Dkt. 53-7.

### E.     The Lawsuit & The Retroactive Consent

Seneca sued McAlvain and others in July 2024, alleging negligence, breach of contract, and breach of the implied warranties of habitability and workmanship. While the lawsuit was pending, McAlvain executed a letter indicating that it retroactively consented to the assignment from 600 Vanguard to Concord Capital. *See McAlvain Dec.,* Dkt. 44., Ex. A thereto. Thereafter, McAlvain moved for summary judgment. In short, McAlvain contends that this entire lawsuit must be dismissed because Baron waived its subrogation rights

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the

---

[1] The relevant provision states: "If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing: 1. Prior to a loss to your Covered Property or Covered Income." *Ex. F to Thielbahr Dec.*, Dkt. 45-7, at SENECA_005335.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In evaluating whether the moving party has met this burden, the Court must view the evidence in the light most favorable to the non-moving party and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).

Once the moving party has met its burden, the non-moving party carries the burden to present evidence showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. The non-moving party must go beyond the pleadings and show

through "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Id.* at 324.

## ANALYSIS

### A.  The Waiver-of-Subrogation Provision

McAlvain's bid for summary judgment largely rests on a single premise: that when Baron purchased The Vanguard apartment building, it stepped into 600 Vanguard's contractual shoes and, accordingly, was bound by the waiver-of-subrogation provision contained in § 11.3 of the General Conditions. Under that theory, Seneca—as Baron's insurer and subrogee—cannot pursue defendants for losses covered by the Seneca policy. As will be discussed, however, the flaw in that premise is equally singular: The waiver in § 11.3 does not apply to post-completion losses *unless* 600 Vanguard was obligated to procure post-completion insurance in the first place. There is no evidence of any such obligation.

Before examining the relevant contractual provisions, the Court will lay out basic rules regarding the interpretation of contracts. When interpreting a contract, the Court "begins with the document's language." *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 226 P.3d 1277, 1280 (Idaho 2010) (citation omitted). "[T]he first step is to determine whether or not there is an ambiguity." *McFarland v. Liberty Ins. Corp.,* 434 P.3d 215, 219 (Idaho 2019) (citation omitted). "A contract is ambiguous if it is reasonably subject to conflicting interpretations." *Caldwell*

*Land & Cattle, LLC v. Johnson Thermal Sys., Inc.,* 452 P.3d 809, 818 (Idaho 2019) (citation omitted). If, however, the language in a contract is clear and unambiguous, its interpretation is a question of law and the language will be given its plain meaning." *Harris v. State ex rel. Kempthorne,* 210 P.3d 86, 90 (Idaho 2009).

### 1. Section 11.3.2 controls the post-completion waiver issue

Section 11.3.2 of the General Conditions addresses the precise issue before the Court: whether the owner's waiver applies after construction is complete. That section states, in relevant part:

> "*if* after final payment *property insurance is to be provided* on the completed Project through a policy or policies other than those insuring the Project during the construction period … the Owner waives all rights in accordance with § 11.3.1 for losses covered by such insurance."

*A201-2017 General Conditions, § 11.3.2, Ex. A to Thielbahr Dec.*, Dkt. 45-2 (emphasis added). The emphasized phrase—"*if ... property insurance is to be provided*"—is conditional. That is, it contemplates that the contracting parties *may* agree that the Owner will procure post-completion property insurance. If there were such a requirement, this would activate the conditional, post-completion waiver. Section 11.3.2 does not say that the waiver applies if the Owner (or, as here, a subsequent purchaser of the property) happens to purchase insurance after completion. There must be an underlying obligation to do so.

MEMORANDUM DECISION AND ORDER - 10

In moving for summary judgment, McAlvain does not point to any agreement obligating 600 Vanguard to obtain post-completion insurance. The parties submitted the General Conditions, but not the underlying agreement that would presumably set forth the owner's insurance obligations. Nor have the moving defendants pointed to any provision in the General Conditions (or any other agreement) that obligated 600 Vanguard to purchase post-completion property insurance. As such, the conditional waiver in § 11.3.2 never activated.

### 2. Section 11.3.1 does not extend the waiver to post-completion policies

The broader language in the immediately preceding section of the General Conditions—§ 11.3.1—does not alter this conclusion. Section 11.3.1 provides that the parties waive claims to the extent losses are covered by "property insurance required by the Agreement or other property insurance applicable to the Project." As just discussed, the record contains no evidence that the parties agreed that the owner would be required to procure property insurance after completion. The question, then, is whether the phrase "other property insurance applicable to the Project" sweeps broadly enough to include any property policy the owner (or, as here, a subsequent owner) might later obtain.

When this phrase is read in context, the answer is no. *See Cristo Viene Pentecostal Church v. Paz,* 160 P.3d 743, 748 (Idaho 2007) ("When interpreting contractual provisions, the agreement must be viewed as a whole to determine the

MEMORANDUM DECISION AND ORDER - 11

parties' intent."). Most significantly, the very next provision in the conditions—§ 11.3.2—directly addresses post-completion insurance and draws a clear distinction between (a) insurance "during the Project construction period," and (b) insurance "on the *completed* Project." It then limits the waiver in the latter circumstance to situations where post-completion insurance "is to be provided"—that is, where the construction contract obligates the owner to obtain such coverage. Reading § 11.3.1 to automatically capture all post-completion policies would render § 11.3.2's limiting language meaningless. Idaho courts avoid interpretations that make contractual language superfluous. *See Steel Farms, Inc. v. Croft & Reed, Inc.*, 297 P.3d 222, 229 (Idaho 2011); *see also Lumbermens Mut. Cas. Co. v. Grinnell Corp.,* 477 F. Supp. 2d 327, 334–35 (D. Mass. 2007). And, perhaps more to the point here, "it is well established that specific provisions in a contract control over general provisions where both relate to the same thing." *City of Meridian v. Petra Inc.*, 299 P.3d 232, 246 (Idaho 2013). Section 11.3.2 is the specific provision governing post-completion policies, and its terms control.

### 3. The Court is persuaded by *Lumbermens* and similar cases

The parties cite several cases interpreting waiver-of-subrogation provisions substantially similar to §§ 11.3.1 and 11.3.2. McAlvain reports that the majority of courts considering the issue favor its interpretation—that is, that the similar waivers contained in the AIA General Conditions extend to post-completion

policies even when those policies are purchased after construction is complete. *See Motion Mem.*, Dkt. 60, at 8 (citing cases, including *Middleoak Ins. Co. v. Tri-State Sprinkler Corp.*, 931 N.E. 2d 470 (Mass. Ct. App. 2010)). The Court is not persuaded by the majority view. It finds the logic in the minority cases such as *Lumbermens Mutual Casualty Co. v. Grinnell Corp.,* 477 F. Supp. 2d 327 (D. Mass. 2007) far more compelling.

In *Lumbermens*, a fire occurred after the project completion and the property owner had obtained a new, separate insurance policy. Construing a waiver-of-subrogation clause similar to the one at issue here, the court held that the waiver did not apply because the construction-period policy had terminated at final payment and—critically—there was no contractual agreement obligating the owner to procure post-completion property insurance. *Id.* at 334-35.

The *Lumbermens* Court relied on the dissent in *Midwestern Indemnity Co. v. Systems Builders, Inc.*, 801 N.E.2d 661 (Ind. Ct. App. 2004) (Baker, J., dissenting). And that dissent focused on the same textual hook the Court finds dispositive here—namely, that § 11.3.2 uses the phrase "is to be provided" when describing post-completion coverage. As the dissent explained, "[t]he qualifier 'to be' is used 'to express intention, *obligation,* or future action." *Id.* (citing Am. Heritage Dictionary 155 (4th ed. 2000)). The dissent went on to conclude that the challenged provision "simply means that if the construction contract creates an

MEMORANDUM DECISION AND ORDER - 13

obligation in the owner to purchase insurance after construction is completed, then a waiver of subrogation results." *Id.* Applying Idaho's basic rules of contract interpretation, this Court reaches the same conclusion.

To be sure, several courts have rejected *Lumbermens*. *See, e.g., Middleoak*, 931 N.E.2d at 475 (describing *Lumbermens'* reading as "too crabbed"); *Colonial Props. Realty Ltd. P'ship v. Lowder Constr. Co.,* 567 S.E.2d 389 (Ga. Ct. App. 2002); *Silverton v. Phoenix Heat Source Sys., Inc.,* 948 P.2d 9 (Colo. App. 1997). But, in the court's view, these sorts of decisions do not carefully account for the conditional nature of the waiver, and some rely on factual scenarios—such as an owner's agreed-upon extension of a construction-phase policy in *Silverton v. Phoenix Heat Source Sys., Inc.,* 948 P.2d 9 (Colo. App. 1997)—not present here.

For all these reasons, the Court will deny McAlvain's motion for summary judgment to the extent it is based on the waiver-of-subrogation provision. In sum, the Court concludes that the contractual provisions at issue are not reasonably susceptible to conflicting interpretations. Moreover, even assuming the provisions were reasonably susceptible to conflicting interpretations, McAlvain's motion for summary judgment would still be denied. *See generally Stranger v. Walker Land & Cattle, LLC*, 498 P.3d 1195, 1202 (Idaho 2021) ("Only where an instrument is 'reasonably subject to conflicting interpretation,' is it ambiguous and inappropriate for decision on a motion for summary judgment due to the factual determinations

that must be made.").

## B. The Contract Claims & Privity

The next question is whether Seneca's contract-based claims should be dismissed due to lack of privity. McAlvain says that if Baron did not assume 600 Vanguard's obligations when it purchased The Vanguard, then the contract claims must be dismissed for lack of privity. Seneca didn't squarely address this privity issue in its response, but it does say that while Baron acquired rights in and to the McAlvain-600 Vanguard contract, it did not assume any obligations before the assignment—including any "obligation to waive subrogation rights."[2]

The Court doesn't need to resolve this dispute to rule on this motion. Under either view, the contract claims may proceed. Assuming McAlvain is correct—and that there was a wholesale assumption of obligations—the contract claims clearly may proceed. McAlvain doesn't argue otherwise. But even accepting Seneca's position that Baron only acquired rights, and not obligations, Seneca still may proceed. Under Idaho law, privity exists when a plaintiff simply holds a cause of action by assignment. *See Groveland Water & Sewer Dist. v. City of Blackfoot*, 505

---

[2] The Court doesn't perceive an "obligation" to waive subrogation rights. Rather, if 600 Vanguard had waived its rights, it couldn't have transferred those waived rights to Concord (and then Baron). The "obligation" at issue here would more accurately be viewed as an obligation to purchase post-completion insurance. As discussed at length above, the record contains no evidence of such an obligation.

P.3d 722, 729 (Idaho 2022). Extending that logic, the Court concludes that a "rights-only" assignee may enforce a contract right even if it did not assume the assignor's duties. Accordingly, Baron is in privity with McAlvain for purposes of enforcing owner rights, and Seneca, as Baron's subrogee, may pursue its breach-of-contract and warranty claims against McAlvain.

There is, however, no privity between Baron and the subcontractor defendants. Accordingly, the Court will grant Shilo's and Builder Services Group's motion for summary judgment on the contract claims.

## C. The Negligence Claim

Turning to the negligence claim, McAlvain contends that this claim is barred for two reasons: (1) application of the economic loss doctrine; and (2) Seneca's failure to allege an independent tort duty. The Court is not persuaded by either argument.

### 1. The Economic Loss Doctrine

As for the economic loss doctrine, the Idaho Supreme Court has held that this doctrine does not bar negligence claims where the plaintiff alleges negligent performance of construction services resulting in physical damage to property. In *Brian & Christie, Inc. v. Leishman Electric, Inc.*, 244 P.3d 166, 170-71 (Idaho 2010), the Idaho Supreme Court held that the "*Salmon Rivers* definition of

"economic loss"[3] applies only in cases involving the purchase of defective property—not in cases involving negligent performance of services. *Id.* at 170. Seneca's negligence claim is similar to the negligence claim brought in *Brian & Christie*. That is, for purposes of applying the economic loss doctrine, the "transactions" at issue here are fairly characterized as involving the provision of construction services (by both McAlvain and the subcontractors) rather than as transactions for the sale of a defective product. Accordingly, the economic loss doctrine does not bar Seneca's negligence claim.

### 2. Independent Duty

Likewise, the Court will not dismiss the negligence claims based on McAlvain's assertion that Seneca failed to allege an independent tort duty. Under Idaho law, a plaintiff asserting both contract and tort claims must identify a tort duty "'separate and apart from any duty allegedly created by the contract.'" *Petrus Family Trust v. Kirk*, 415 P.3d 358, 369 (Idaho 2018) (citation omitted). Put differently, a "mere negligent breach or nonperformance of a contract will not sustain an action sounding in tort in the absence of a liability imposed by law independent of that arising out of the contract itself." *Baccus v. Ameripride Servs.,*

---

[3] The *Salmon Rivers* definition of economic loss is as follows: "Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss of inadequate value and consequent loss of profits or use." *See Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 544 P.2d 306, 309 (Idaho 1975)).

*Inc.*, 179 P.3d 309, 313 (Idaho 2008) (quoting *Steiner Corp. v. American Dist. Telegraph*, 683 P.2d 435, 438 (1984)).

This argument did not receive much attention in the briefing. McAlvain raised the argument in its motion, arguing that the duties Seneca alleged in support of the negligence action were "almost identical" to the obligations alleged in support of the contract. *Motion Mem.*, Dkt. 43-1, at 16. In response, Seneca pointed out that Idaho law imposes a general, common-law duty not to damage the property of another, citing *Oppenheimer Industries, Inc. v. Johnson Cattle Co.*, 732 P.2d 661 (Idaho 1986). *See Response,* Dkt. 53, at 19-20 (arguing that "even where parties are bound by contract, Idaho recognizes that duties arising under common law or statute—such as the duty to avoid damaging another's property—may give rise to independent tort liability"). McAlvain did not squarely address this argument in its reply. The Court will therefore deny McAlvain's motion for summary judgment on the negligence claims. However, given the lack of attention this issue received in the briefing, the Court may need to revisit it in the run-up to trial.

## D.   Additional Arguments

Finally, the Court will note that the parties raised a host of additional arguments in the briefing. *See Reply,* Dkt. 60, at 2 (observing that in opposing the motion, Seneca "argues everything but the kitchen sink . . . ."). Given the above

**MEMORANDUM DECISION AND ORDER - 18**

rulings, the Court does not find it necessary to resolve these arguments.

## ORDER

IT IS ORDERED that:

1. Defendant McAlvain Construction, Inc.'s Motion for Summary Judgment (Dkt. 43), joined by Defendants Shilo Automatic Sprinkler, Inc. and Builders Services Group, Inc. (Dkts. 50, 62), is **GRANTED IN PART and DENIED IN PART** as follows:

2. McAlvain's motion (Dkt. 43) is **DENIED IN ITS ENTIRETY.**

3. Shilo Automatic Sprinkler, Inc.'s and Builder Services Group, Inc's joining motions (Dkts. 50, 62) are **GRANTED** to the extent that Seneca's contract and warranty claims against these defendants are **DISMISSED**. The joining defendants' motions are **DENIED** in all other respects.

DATED: December 4, 2025

_____
B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 19