# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SENECA INSURANCE COMPANY as subrogee of BARON EQUITIES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MCALVAIN CONSTRUCTION, INC., an Idaho corporation; HOLST ARCHITECTURE, INC., an Oregon corporation; SHILO AUTOMATIC SPRINKLER, INC., an Idaho corporation; BUILDER SERVICES GROUP, INC., a Florida corporation; TREASURE VALLEY GENERAL CONSTRUCTION, LLC, an Idaho limited liability corporation; and DOES 1 through 5, inclusive.<br><br>Defendants. | Case No. 1:24-cv-00340-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |
| MCALVAIN CONSTRUCTION, INC.,<br>Cross-Plaintiff,<br><br>v.<br><br>SHILO AUTOMATIC SPRINKLER, INC., an Idaho corporation; BUILDER SERVICES GROUP, INC., a Florida corporation; and TREASURE VALLEY GENERAL CONSTRUCTION, LLC, an Idaho limited liability company,<br><br>Cross-Defendants. | |

MEMORANDUM DECISION AND ORDER - 1

## INTRODUCTION

In December 2025, this Court denied Defendant and Cross-Plaintiff McAlvain Construction, Inc.'s motion for summary judgment. McAlvain now asks the Court to reconsider that ruling and grant summary judgment in its favor. Alternatively, McAlvain asks the Court to certify an interlocutory appeal and stay this matter until the appeal is resolved. For the reasons explained below, the Court will deny the motion for reconsideration and the alternative request to certify an interlocutory appeal.

## BACKGROUND[1]

### A.    The January 2024 Loss

In January 2024, a fire-suppression water line located in The Vanguard—an eight-story apartment building in downtown Boise—froze and burst, causing extensive damage. Baron Equities, Inc., the owner of the building, submitted a claim to its insurance company, Seneca Insurance Company. Seneca paid the claim, and then sued as Baron's subrogee. The defendants in this matter include the general contractor, McAlvain Construction, Inc., the architect, Holst Architecture, Inc., and subcontractors Shilo Automatic Sprinkler, Inc., Builder Services Group,

---

[1] Although the parties are familiar with the background of this case, the Court will ground the discussion by repeating, albeit with some minor modifications, the statement of facts set forth in the December 4, 2025 Order. *See* Dkt. 88, at 2-7

Inc., and Treasure Valley General Construction, LLC.

**B.      600 Vanguard LLC and McAlvain Enter into a Contract for Construction of The Vanguard Apartment Building**

The Vanguard is a relatively new building; construction began a few years before the January 2024 loss and was completed by March 2022. The previous owner of the property, 600 Vanguard LLC, engaged McAlvain as the general contractor. McAlvain, in turn, engaged subcontractors to perform portions of the work, including Shilo Automatic Sprinkler, Builder Services Group, and Treasure Valley Construction.

The parties have not provided the Court with all of the construction contracts, but they have supplied the general conditions McAlvain and 600 Vanguard agreed upon. These conditions are contained in an American Institute of Architects (AIA) document known as the *AIA A201-2017 General Conditions of the Contract for Construction*. *See Ex. A to Thielbahr Dec.*, Dkt. 45-2. Three sections of the General Conditions—Sections 11.3.1, 11.3.2, and 13.2.1—are discussed in the briefing.

Sections 11.3.1 and 11.3.2 deal with insurance and related waivers. Specifically, in § 11.3.1 the parties agreed to waive rights against each other for damages caused by fire or other causes of loss, to the extent such losses were covered by property insurance required by the agreement or otherwise applicable to the project. The waiver-of-subrogation clause states:

MEMORANDUM DECISION AND ORDER - 3

> **§ 11.3.1** The Owner [600 Vanguard] and Contractor [McAlvain] waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents, and employees, each of the other . . . for damages caused by fire, or other causes of loss, to the extent those losses are covered by property insurance required by the Agreement or other property insurance applicable to the Project . . . .

*General Conditions,* Dkt. 45-2, § 11.3.1.

The next section, § 11.3.2 provides that if, after final payment, insurance is to be provided on the completed project, then the waiver just discussed would continue in effect to the extent permissible under such policies:

> **§ 11.3.2** If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or *if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, to the extent permissible by such policies, the Owner waives all rights in accordance with the terms of Section 11.3.1 for damages caused by fire or other causes of loss covered by this separate property insurance.*

*Id.* § 11.3.2 (emphasis added).

In the third relevant clause, McAlvain and 600 Vanguard agreed that their successors and assigns would be bound by their agreement, although they agreed that neither party would assign the "Contract as a whole" without written consent of the other. The successors-and-assigns clause is shown here:

> **§ 13.2 Successors and Assigns**
> **§ 13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns, and legal representatives to covenants, agreements, and obligations contained in the Contract Documents. Except as provided in Section 13.2.2 [which is not relevant here], neither party to the

MEMORANDUM DECISION AND ORDER - 4

Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

*Id.* § 13.2.1.

## C. Concord Capital Partners Enters into a Purchase & Sale Agreement with 600 Vanguard

In May 2021, 600 Vanguard agreed to sell The Vanguard to Concord Capital Partners, LLC for $23 million. The parties memorialized their agreement in a Commercial/Investment Real Estate Purchase and Sale Agreement (PSA). *See Ex. B to Thielbahr Dec.*, Dkt. 45-3. The PSA contains a detailed listing of items included in the sale, which included 600 Vanguard's "rights in and to" the "Construction Contracts"—including the warranties and guaranties related to those contracts. The relevant provision states:

> INCLUDED ITEMS: …. Other items specifically INCLUDED in this sale: … Seller's rights in and to (a) all design, engineering, and construction contracts pertaining to the improvements on the Real Property . . . (collectively, "Construction Contracts"), and the warranties and guaranties related to any such Construction Contracts . . . .

*Id.*

In a separate section, titled "Condition of Property at Closing," Concord assumed "all obligations with respect to the Property to the extent arising or accruing after the Closing Date, to the extent such obligations are necessary to maintain proper maintenance or operation of the Property, or to the extent

MEMORANDUM DECISION AND ORDER - 5

expressly agreed to be assumed by [Concord]." *Id.* § 16. In an addendum, 600 Vanguard agreed that it would "maintain (a) or cause the contractor(s) under Construction Contracts to maintain builder's risk insurance in the amount of the cost to cause Final Completion, and (b) commercial general liability insurance which is at least equivalent in all material respects to such insurance policy covering the Property as of the date of mutual execution of this Agreement." *Id. Addendum #1, § 5(f).* After several addendums, the PSA was to close on April 23, 2022.

D.      **Baron Acquires the Building and Obtains Commercial Insurance**

The City of Boise issued a Certificate of Occupancy for the apartment building on March 25, 2022. Shortly afterward, on or about April 4, 2022, Concord assigned its rights in the PSA to Baron. Concord and Baron memorialized their agreement in an Agreement for Assignment and Assumption of Commercial/Investment Real Estate Purchase and Sale Agreement. *See Ex. C to Thielbahr Dec.,* Dkt. 45-4. After acquiring The Vanguard, Baron obtained commercial property insurance from Seneca. According to Baron's CEO, Heath Gregory, Baron: (1) purchased a Seneca policy effective April 26, 2022 – April 26, 2023; (2) purchased a one-month extension through May 26, 2023, and then (3) purchased a new Seneca policy effective May 26, 2023 – May 26, 2024. *Gregory Dec.* ¶ 7, Dkt. 53-7.  Mr. Gregory states that the Seneca policies Baron obtained

MEMORANDUM DECISION AND ORDER - 6

were not builder's risk policies and were not intended to continue or replace any prior coverage maintained by 600 Vanguard, McAlvain, or any other party. *Id.* ¶ 8. The Seneca policy permits Baron to waive rights in writing under certain conditions.[2] *See Ex. F to Thielbahr Ex.,* Dkt. 45-7. Baron did not execute a separate waiver before the loss. *See Gregory Dec.* ¶ 9, Dkt. 53-7.

### E.       The Lawsuit & The Retroactive Consent

Seneca sued McAlvain and others in July 2024, alleging negligence, breach of contract, and breach of the implied warranties of habitability and workmanship. While the lawsuit was pending, McAlvain executed a letter indicating that it retroactively consented to the assignment from 600 Vanguard to Concord Capital. *See McAlvain Dec.,* Dkt. 44., Ex. A thereto. Thereafter, McAlvain moved for summary judgment. In a nutshell, McAlvain contended that Seneca's entire lawsuit should be dismissed because Baron had waived its subrogation rights. McAlvain also contended that the negligence claim was barred by the economic-loss doctrine.

### F.       The Court's Summary Judgment Ruling

In December 2025, the Court denied McAlvain's motion, concluding that

---

[2] The relevant provision states: "If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing: 1. Prior to a loss to your Covered Property or Covered Income." *Ex. F to Thielbahr Dec.*, Dkt. 45-7, at SENECA_005335.

the waiver-of-subrogation clause did not apply because there was no contractual obligation for 600 Vanguard to procure post-completion insurance. In other words, the Court rejected McAlvain's contention that the waiver-of-subrogation clause barred Seneca's lawsuit. The Court also rejected McAlvain's contention that the economic-loss doctrine barred Seneca's negligence claim.

## GOVERNING LEGAL STANDARDS

### A.      Reconsideration

McAlvain moves for reconsideration under Federal Rule of Civil Procedure 54(b). Under that rule, the Court can revise an interlocutory ruling at any time under its inherent authority. *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.") (internal quotation marks and citation omitted). However, although a court has the power to revisit its own decision for any reason, "as a rule the court should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817 (1988) (internal quotation marks and citation omitted). Regardless of the standard or rule under which they are brought, "motions for reconsideration are generally

MEMORANDUM DECISION AND ORDER - 8

disfavored, and may not be used to present new arguments or evidence that could have been raised earlier." *American Rivers v. NOAA Fisheries,* No. CV-04-00061-RE, 2006 WL 1983178, at *2 (D. Or. 2006) (citing *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1442 (9th Cir. 1991)).

Thus, while courts have the inherent authority to review interlocutory orders at any time prior to entry of final judgment, to determine the merits of a request to reconsider an interlocutory order, both this Court and district courts throughout the Ninth Circuit are frequently guided by substantially the same standards as those used to reconsider final orders pursuant to Rule 59(e)—meaning that absent highly unusual circumstances, a motion for reconsideration will not be granted unless the district court is presented with newly discovered evidence, committed clear error, or there is an intervening change in the controlling law. *See generally Kona Enters., Inc. v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir. 2000); *Balla v. Idaho State Bd. of Corr.,* 2014 WL 12614478, at *2 (D. Idaho 2014) ("In general, a court will grant a motion for reconsideration of an interlocutory order only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.") (citation omitted). The Court's consideration of the pending motion will be guided by this three-part inquiry, although the Court recognizes that, ultimately, "[w]hether or not to grant reconsideration is committed to the sound discretion of

MEMORANDUM DECISION AND ORDER - 9

the court." *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003) (citing *Kona*, 229 F.3d at 883).

**B.      Certification of Interlocutory Appeal**

Under 28 U.S.C. § 1292(b), a district court may certify an otherwise non-final order for interlocutory appeal if: (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion on that question; and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 687-88 (9th Cir. 2011). Movants seeking an interlocutory appeal under § 1292(b) must shoulder a heavy burden to show that exceptional circumstances justify departing from the basic policy of postponing appellate review until after final judgment. *See generally James v. Price Stern Sloan, Inc.,* 283 F.3d 1064, 1067 n.6 (9th Cir. 2002) ("Section 1292(b) is a departure from the normal rule that only final judgments are appealable, and therefore must be construed narrowly."). And "[w]hile Congress did not specifically define what it meant by 'controlling,' the legislative history of 1292(b) indicates that this section was to be used only in exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation." *In re Cement Antitrust Litig.,* 673 F.2d 1020, 1026 (9th Cir. 1982) (citations omitted). "[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the

outcome of litigation in the district court." *Id.* (citation omitted). However, this definition of "controlling" is viewed in light of "the congressional directive that section 1292(b) is to be applied sparingly and only in exceptional cases, and that the 'controlling question of law' requirement be interpreted in such a way to implement this policy." *Id.* at 1027 (citations omitted).

## ANALYSIS

### A.   The Motion for Reconsideration

#### 1.   Contract Interpretation

The Court will deny McAlvain's request to reconsider its ruling on the contract-interpretation issue. At bottom, McAlvain is largely reasserting the same arguments it advanced at summary judgment. That is not a proper basis for reconsideration. Motions for reconsideration are not vehicles to relitigate issues that have already been fully briefed and decided. McAlvain has not argued that there is a change in the controlling law, nor has it presented any newly discovered evidence. Rather, the motion rests on its assertion that the Court clearly erred.

The Court is not persuaded that it has. Rather, McAlvain has simply identified an alternative interpretation of the relevant contractual provisions. The mere existence of a competing interpretation does not establish clear error. Put simply, even if the Court's prior ruling were ultimately incorrect, it was not "dead wrong." That is the demanding standard McAlvain must satisfy here, and it has not

MEMORANDUM DECISION AND ORDER - 11

done so.

The Court's prior ruling was grounded in Idaho's well-established rules of contract interpretation. Applying those principles, the Court concluded that the waiver-of-subrogation provision did not apply absent an extant obligation to procure post-completion property insurance. Contrary to McAlvain's contention, the Court did not impose an extra-contractual "obligation to procure" gloss; rather, it interpreted the contract as written, including the interplay between Sections 11.3.1 and 11.3.2. That remains the Court's view of the contract.

Upon reconsideration, however, the Court is persuaded that the contract is reasonably susceptible to more than one interpretation. But as the Court indicated in its initial ruling, that ambiguity is sufficient to defeat McAlvain's motion for summary judgment. *See Dec. 4, 2025 Order,* Dkt. 88, at 14 ("[E]ven assuming the provisions were reasonably susceptible to conflicting interpretations, McAlvain's motion for summary judgment would still be denied."). Accordingly, this case will proceed to trial.

It's also worth noting that it would be a rare case indeed in which a court "clearly erred" simply by identifying two competing, reasonable interpretations of a contract, but choosing one as better reasoned. McAlvain's own briefing underscores this point, as it ultimately argues that its preferred interpretation is the "better reasoned" one. *See Mtn. Mem.,* Dkt. 89-1, at 9-10 (arguing that "the Order's

MEMORANDUM DECISION AND ORDER - 12

'obligation-to-procure' gloss is not supported by the contract text and is contrary to the better-reasoned majority approach."). That is a merits argument; it is not a showing of clear error.

In the end, this is a straightforward situation where a litigant disagrees with a Court's ruling—not a situation where the Court clearly erred. The proper mechanism to challenge such a ruling is an appeal following final judgment.

## 2.  The Economic-Loss Doctrine

McAlvain next contends the Court clearly erred when it concluded that Seneca's negligence claim could proceed notwithstanding the economic-loss doctrine. On this point, the Court is again not persuaded that reconsideration is warranted.

The Court begins by acknowledging that this is a close question. McAlvain has advanced a solid argument, particularly in terms of its reliance on *Tusch Enterprises v. Coffin*, 740 P.2d 1022 (Idaho 1987). *Tusch* and similar cases stand for the proposition that when a plaintiff purchases defective property and seeks the cost of repairing that property, along with related economic losses such as lost rents, the economic-loss doctrine bars recovery in negligence. There is no serious dispute that this case bears some resemblance to that line of authority.

At the same time, however, this case also contains features that distinguish it from a straightforward *Tusch*-type scenario. Most notably, the PSA did not merely

MEMORANDUM DECISION AND ORDER - 13

transfer ownership of the building; it also transferred to Concord—and ultimately to Baron—"rights in and to" the construction contracts, together with the warranties and guaranties associated with those contracts. In other words, this is not a straightforward downstream-purchaser case in which the plaintiff's only relationship to the construction is ownership of a finished product. Rather, Plaintiff stands in a hybrid position, possessing both ownership of the property and contractual rights tied directly to the construction process itself.

That hybrid posture lends support to the Court's original conclusion that, for purposes of applying the economic-loss doctrine, the "transactions" at issue may reasonably be characterized as involving the provision of construction services, rather than solely the purchase of a defective product. *See Brian & Christie, Inc. v. Leishman Electric, Inc.*, 244 P.3d 166 (Idaho 2010).

The Court acknowledges that its prior ruling was not the only permissible interpretation of Idaho law. To the contrary, McAlvain has advanced a reasonable argument that this case could be analyzed under the *Tusch* framework. But that is not the standard on reconsideration. The question is not whether the Court might have reached a different conclusion in the first instance, but whether its prior ruling was clearly erroneous. It was not.

Finally, the Court will observe that the economic-loss doctrine, particularly outside the products-liability context in which it originated, is notoriously difficult

MEMORANDUM DECISION AND ORDER - 14

to apply. *See, e.g., Giles v. General Motors Acceptance Corp.,* 494 F.3d 865, 874 (9th Cir. 2007) (observing that when the economic-loss doctrine is applied to cases outside the product liability context, it "has produced difficulty and confusion"). Courts have long recognized that the line between contract and tort in this area is easier to articulate than to draw. *See id.* (quoting a judge who lamented that "the [economic loss] rule has been stated with ease but applied with great difficulty") (citation omitted). This case illustrates the difficulty of applying the economic-loss rule. In such circumstances, where reasonable jurists could disagree about how best to classify the transaction at issue, it cannot be said that the Court committed clear error by adopting one reasonable interpretation over another.

In short, while McAlvain has identified a plausible alternative framework grounded in *Tusch*, it has not shown that the Court's reliance on *Brian & Christie* was clearly erroneous. Accordingly, the Court will deny McAlvain's motion to reconsider its prior ruling on the economic-loss doctrine.

## B.    The Request to Certify an Interlocutory Appeal

McAlvain alternatively requests that the Court certify its prior order for interlocutory appeal and stay this case pending resolution of that appeal. The Court will deny that request.

In theory, many litigants would like to pause proceedings in district court for a quick trip to the circuit to obtain appellate guidance on contested legal issues. In

MEMORANDUM DECISION AND ORDER - 15

a world of boundless judicial resources, such a process might promote efficiency. But that is not how the federal system is structured. As a general rule, parties are not entitled to appeal interlocutory rulings, even when the district court's rulings involve difficult questions. As noted above, interlocutory appeals are to be used only in exceptional circumstances.

This case does not present exceptional circumstances justifying certification of an interlocutory appeal. While McAlvain plainly disagrees with the Court's rulings, the Court is not persuaded that an immediate appeal would materially advance the termination of this litigation. To the contrary, certification at this stage would likely delay, rather than expedite, resolution of the case. The Court will therefore deny the request for certification under 28 U.S.C. § 1292(b).

## ORDER

**IT IS ORDERED that**:

(1)  McAlvain's Motion for Reconsideration (Dkt. 89) is **DENIED.**

(2)  McAlvain's Request to Certify an Interlocutory Appeal is **DENIED.**



DATED: May 13, 2026

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 16